*Adcor Industries, Inc. v. Beretta USA Corp.*, No. 118, September Term, 2019, Argued: September 2, 2020

**CONTRACTS – NONDISCLOSURE AGREEMENTS**
Contracts are voluntary undertakings that obligate the parties to duties and responsibilities that they otherwise wouldn't have assumed. The risks of signing a contract are many and often unforeseen. Before signing a contract, the parties must assess whether the expected benefits of the transaction outweigh the risks, including the possibility that they underestimated or failed to protect against all of the risks. If they decide to proceed, it means that they accepted all risks and mutually agreed to the rules governing their relationship moving forward. Parties enter into contracts with the reasonable expectation that the courts will enforce those rules.

**CONTRACTS – NONDISCLOSURE AGREEMENTS - DAMAGES**
Damages for the breach of a nondisclosure agreement are treated in the same manner as other contracts. The allocation of risk reflected in nondisclosure agreements is just as important and central to the expectations of the parties as it is with respect to other types of contracts.

**CONTRACTS – NONDISCLOSURE AGREEMENTS - DAMAGES**
The settled measure of contract damages under Maryland law serves its function for nondisclosure agreements as much as it does for other contracts.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0118

September Term, 2019

_____

ADCOR INDUSTRIES, INC., ET AL.

v.

BERETTA U.S.A. CORP.

_____

Wells,
Gould,
Eyler, James R.
  (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Gould, J.
_____

Filed:  April 1, 2021

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The ability of businesses to exchange information, particularly confidential and proprietary information, is a critical component of a functioning, free-market based economy. Such information often includes financial data and records, business plans, marketing plans, budgets, technical data, formulas, and the like. To facilitate the sharing of information, it is common for parties to enter into an agreement known as a non-disclosure agreement or an NDA. Among other things, NDAs generally limit the disclosure of the sensitive information to a defined circle of people and specify its permitted uses.

This case involves the fallout when the recipient of the information—the receiving party under the NDA—decided not to proceed with the contemplated transaction with the disclosing party, and then breached the NDA by failing to return all of the information it had received. The jury found the receiving party liable to the disclosing party in the amount of $20 million in compensatory damages. The trial judge, however, found that the evidence did not support the jury's finding of damages, and reduced the judgment from $20 million to $1.

The disclosing party appealed, and presents us with a single question:

Did the trial court err by improperly granting Appellee's Motion for Judgment Notwithstanding the Verdict, vacating the jury's damages award in favor of Appellants and entering judgment in the amount of one dollar?

We answer that question in the negative and affirm the judgment of the circuit court.

## BACKGROUND

Appellants Adcor Industries, Inc. and Adcor Defense, Inc. (together, "Adcor") are Baltimore-based Maryland corporations in the business of designing and manufacturing bottling components, aerospace parts, and firearms. Adcor was founded in 1989 by Demetrios ("Jimmy") Stavrakis when he was 23 years old. Adcor's foray into the firearms manufacturing business began when it was hired by Colt Manufacturing to produce a component to the M-16 rifle.

From that experience, Adcor concluded that it had the know-how and experience to build a better firearm that could be used by police and the military. Adcor spent the next several years, and incurred $12 million in research and development costs, building an AR-15 platform rifle known as the "Adcor B.E.A.R."[1] The Adcor B.E.A.R. went to market in or about 2012.

Appellee Beretta U.S.A. Corporation ("Beretta") is a Maryland company that designs, manufactures, and sells firearms, shooting gear, accessories, bags, luggage, holsters, optics, and apparel. In 2012, Beretta was looking to enter the market for the AR-15, the most popular semi-automatic rifle in the United States. Beretta could have invested the time and money necessary to reverse engineer and design its own AR-15-style product, but it was looking for a shortcut into the market. That's where Adcor came into the picture.

---

[1] Although the sale of AR-15 style rifles has been prohibited in the State of Maryland since October 1, 2013, CR §4-303; PS §5-101(r)(2)(xv); *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), manufacture in the State of Maryland for sale elsewhere is expressly permitted. CR §4-302(3)(ii).

Beretta's idea was to combine Adcor's technical and manufacturing know-how with Beretta's marketing expertise to roll out a Beretta-branded but jointly-developed product that would be called the BRX-15.

To explore the potential for such a venture and to protect its proprietary information, Adcor required Berretta to sign a nondisclosure agreement (the "NDA"). Section 2 of the NDA prohibited Beretta from disclosing Adcor's confidential information, and required Beretta to return the information upon Adcor's written request. Section 3 of the NDA stated:

> The Covenantor [Beretta] acknowledges that a breach of Section 2 will irreparably and continually damage Adcor or other appropriate Adcor Affiliate and that money damages in the event of such a breach may not be adequate to remedy such a breach and that such damages may be difficult to ascertain. Consequently, the Covenantor agrees that, in the event the Covenantor breaches or threatens to breach any of the provisions of Section 2, the appropriate Adcor Entity shall be entitled to (i) injunctive relief to enforce such provisions and specific performance of such provisions and (ii) money damages. Nothing in this Agreement, however, shall be construed to prohibit the appropriate Adcor [Entity] or its Affiliates from also pursuing any other remedy (whether, at its option, in conjunction with or in lieu of any one or more of the aforementioned remedies), the parties having agreed that all remedies shall be cumulative and supplementary. As part of its money damages for the period of time during which the Covenantor breaches [Section] 2 the appropriate Adcor Entity shall be entitled to recover the amount of fees, compensation, or other remuneration earned by the Covenantor as the result of any breach of [Section] 2.

During the two-year period in which the parties explored a possible joint venture, Adcor disclosed to Beretta substantial confidential or proprietary information, including Adcor's entire Technical Data Package ("TDP"). Adcor considered its TDP and the other disclosed information to be valuable—indeed, Adcor likened its TDP to a "secret sauce"

3

that made its product unique.[2] Adcor protected its confidential and proprietary information by, among other things, requiring its employees to sign confidentiality agreements and storing its proprietary information on secure computer servers.

In addition to sharing its confidential and proprietary information, Adcor manufactured prototypes for the BRX-15 in 2014. Beretta filed three marketing applications with the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") for the BRX-15.[3] During this time, Adcor believed that it was moving forward with Beretta to co-develop and manufacture the BRX-15.

Adcor's belief turned out to be wishful thinking. In October 2014, Beretta sent a letter to Adcor stating:

> It is with regret that I must inform you that Beretta USA will be removing the equipment we recently purchased from your facility.
>
> We have enjoyed working with you over the course of the last several years and regret that we were unable to form a mutually acceptable partnership on the AR platform. Now, due to changing dynamics in the market place, the desire to keep our workforce gainfully employed in the Accokeek facility, and our upcoming move to Tennessee, we intend to machine Pico and A300 Outlander parts in house.

---

[2] The extent to which the information provided by Adcor met the definition of "Confidential Information," as defined in the NDA, was vehemently disputed by Beretta at trial. The resolution of this appeal, however, does not require us to decide which categories or pieces of information did or did not qualify as "Confidential Information." Thus, we will assume that such information was Confidential Information.

[3] Firearms manufactured in the United States must, under federal law, be marked with certain identifying information. In lieu of those requirements, a manufacturer may apply for a marketing variance from the ATF, which would permit another method for identifying the firearm. 18 U.S.C. § 923(i); 26 U.S.C. § 5842; 27 CFR § 478.92 and § 479.102.

In addition, we wanted to provide you with formal feedback on your quotes for the BRX-15 upper and lower receivers. We were able to obtain superior pricing on comparable products in the magnitude of 50% less. Our attempts to negotiate with you have been unsuccessful and therefore we must source these parts elsewhere to remain competitive in the marketplace.

In the next several days we will be sending a technical crew to your facility to disconnect the machines and pack up the items that we purchased under our recent agreement, as well as the A300 fixtures and tooling that were delivered to you from MPC. Minimal support will be required by your staff.

Thank you again for all of your hard work and support of our company, and best wishes for your continued success.

Adcor was blindsided by this letter. With the relationship now at its end, Adcor demanded that Beretta return its confidential and proprietary information as required by the NDA. In a subsequent telephone conversation between Mr. Stavrakis and Beretta's chief operating officer, Jeff Cooper, Mr. Stavrakis indicated that Adcor might sue Beretta.

Beretta made efforts to comply with Adcor's demands by gathering, segregating, and returning information, but Beretta admitted that it retained at least one copy of Adcor's proprietary information.[4] Several Beretta witnesses testified that they weren't told to delete, destroy, or return any of Adcor's confidential materials. Beretta admits that "not all Beretta employees followed the collection protocol fully or recalled being instructed to destroy Adcor information."

After concluding that the market for AR-15 "platform" was saturated, Beretta eventually decided not to continue with the BRX-15 project. Beretta never received any revenue from the BRX-15.

---

[4] Beretta contends that it lawfully retained a copy set in case Adcor made good on its threat to sue.

In 2015, Adcor filed a 17-count complaint against Beretta, alleging breach of contract, misappropriation of trade secrets, unjust enrichment, violation of the NDA, and other related counts. The complaint underwent numerous amendments. Ultimately, the operative complaint became the Sixth Amended Complaint. The Sixth Amended Complaint contained 16 counts, generally described as follows:

- Count I – Breach of Contract – Beretta breached a contract to develop, manufacture, market, and/or sell an AR-15 rifle together with Adcor;

- Count II – Detrimental Reliance – Adcor detrimentally relied upon Beretta's clear and definite promise to co-develop, manufacture, market, and/or sell an AR-15 rifle with Adcor;

- Count III – Quantum Meruit – In connection with its expectation that it would co-develop, manufacture, market, and/or sell an AR-15 rifle with Beretta, Adcor provided valuable services, technical data, model drawings, vendor lists, prices, troubleshooting, and expertise to Beretta and received nothing from Beretta in return;

- Count IV – Breach of Partnership Agreement – Beretta breached a partnership agreement to design, manufacture, assemble, market and sell an AR-15 rifle with Adcor;

- Count V – Violation of Duty of Partnership – Beretta breached its duty as a partner of Adcor to design, manufacture, assemble, market and sell an AR-15 rifle with Adcor;

- Count VI – Wrongful Dissociation of Partnership – Beretta wrongfully disassociated itself from partnership with Adcor to design, manufacture, assemble, market and sell an AR-15 rifle with Adcor;

- Count VII – Unfair Competition – Misappropriation of Trade Secrets – Beretta wrongfully acquired Adcor's trade secrets so that it could develop the AR-15 rifle without Adcor;

- Count VIII – Unfair Competition – Misappropriation of Products – Beretta disclosed Adcor's trade secrets and products so that it could develop the AR-15 rifle without Adcor;

6

- Count IX – <u>Fraud/Intentional Misrepresentation</u> – Beretta fraudulently represented that it would develop, manufacture, assemble, market, and sell an AR-15 rifle with Adcor;

- Count X – <u>Fraudulent Concealment</u> – Beretta failed to disclose to Adcor that it did not intend to develop, manufacture, assemble, market, and sell an AR-15 rifle with Adcor;

- Count XI – <u>Violation of Non-Disclosure Agreement</u> – Beretta signed an NDA that represented that it would not disclose confidential information and breached that agreement;

- Count XII – <u>Negligent Misrepresentation</u> – Beretta breached its duty of care to provide accurate information about the proposed venture with Adcor to design, assemble, market and sell an AR-15 rifle;

- Count XIII – <u>Unjust Enrichment</u> – Adcor conferred a benefit to Beretta by providing technical information, technical data, model drawings, tolerances, manufacturing techniques, materials, expertise, price lists, and vendor lists, to manufacture an AR-15 rifle, without giving anything in return;

- Count XIV – <u>Usurpation of Corporate Opportunity</u> – Beretta usurped the opportunity belonging to the partnership between Adcor and Beretta to develop and market an AR-15 rifle;

- Count XV – <u>Breach of Contract – Pico Slide</u> – Beretta breached agreements to purchase equipment to manufacture the Pico pistol slide at Adcor and to manufacture the Pico pistol slide at Adcor's facility; and

- Count XVI – <u>Detrimental Reliance – Pico Slide</u> – Adcor detrimentally relied upon Beretta's promise regarding the manufacture of the Pico pistol slide at Adcor.

Adcor requested various forms of equitable relief, including an injunction prohibiting Beretta from using or disclosing any of the protected information, and compensatory and punitive damages.

After discovery closed, Beretta moved for summary judgment on each of the counts. The court granted summary judgment as to the following eight counts:  Breach of Contract

(Count I); Breach of Partnership Agreement (Count IV); Violation of Duty of Partnership (Count V); Wrongful Dissociation of Partnership (Count VI); Unfair Competition – Misappropriation of Trade Secrets (Count VII); Unfair Competition – Misappropriation of Products (Count VIII); Usurpation of Corporate Opportunity (Count XIV); and Breach of Contract – Pico Slide (Count XV).

The court denied Beretta's summary judgment motion as to Adcor's counts for Detrimental Reliance (Count II); Quantum Meruit (Count III); Fraudulent/Intentional Misrepresentation (Count IX); Fraudulent Concealment (Count X); Violation of Non-Disclosure Agreement (Count XI); Negligent Misrepresentation (Count XII); Unjust Enrichment (Count XIII); and Detrimental Reliance – Pico Slide (Count XVI).

The case proceeded to trial on these remaining counts.

At the close of Adcor's case-in-chief, and upon Beretta's motion for judgment, the circuit court granted judgment against Adcor on all counts but one: Count XI for breach of the NDA. Though expressing concern about a lack of evidence of damages caused by any breach of the NDA, the circuit court allowed the claim to proceed to the jury.

Beretta presented eleven witnesses in its defense case-in-chief. Adcor did not put on a rebuttal case. At the conclusion of the evidence, Beretta renewed its motion for judgment, which the court denied.

The trial judge gave the following jury instruction on damages:

If you find for the Plaintiff on the issue of liability, then you must consider the question of damages. It will be your duty to determine what, if any[,] award will fairly compensate the Plaintiff[s]. The Plaintiff[s] have the burden to prove by a preponderance of the evidence each item of damage claim to be caused by the Defendant. In considering the items of damage

8

you must keep in mind that your award must adequately and fairly compensate the Plaintiff. However, an award should not be based on guesswork. A party to a contract which has been broken may recover nominal damages of $1.00, even though he or she fails to prove . . . he or she suffered actual damages.

During closing argument, Adcor argued that the jury could award the amount of money Adcor spent developing the Adcor B.E.A.R.—$12 million. Adcor also argued that the jury could award damages equal to the profits that Beretta projected on the sale of the BRX-15—$36 million. Adcor did not explain to the jury the causal connection between the specific breach of the NDA and the damages it was seeking. Instead, Adcor suggested that Beretta would resume its efforts to bring the BRX-15 to market after the case was over. Adcor's counsel stated:

> The retention provision of the NDA acknowledges the reality of the business world. That you could have somebody who deals with you in bad faith, takes that information. And when you sue them they can say, well, I'm not doing anything with it. The problem is, once the cat's out of the bag it's . . . kind of hard to put it back in. The problem is that there's nothing other than you to stop them from doing it the moment this case is over. That's why retention alone is punishable, regardless of usage and regardless of dissemination.

The jury returned a verdict in favor of Adcor on its claim for breach of the NDA, and awarded Adcor $20 million in compensatory damages.

In a consolidated filing, Beretta moved for judgment notwithstanding the verdict pursuant to Maryland Rule 2-532, for a new trial or a remittitur pursuant to Rule 2-533, and to revise the judgment pursuant to Rule 2-535. Among other things, Beretta argued that: (1) the evidence did not support the jury's finding that it breached the NDA; and (2) the evidence did not support the jury's award of compensatory damages. The court resolved the motions without reaching the first issue, finding that even if Adcor had proven

9

a breach, Adcor nevertheless failed to adduce evidence of actual damages resulting from the breach. The court vacated the jury's award of damages and ordered entry of a new judgment in favor of Adcor for nominal damages in the amount of one dollar.

Adcor filed a timely notice of appeal.

## DISCUSSION

### I.

### STANDARD OF REVIEW

"We review a grant or denial of a motion for JNOV for legal correctness, by viewing the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party, and determining whether the facts and circumstances only permit one inference with regard to the issue presented." *Stracke v. Estate of Butler*, 465 Md. 407, 420 (2019) (cleaned up). "If there is no rational ground under the law governing the case for upholding the jury's verdict, JNOV must be granted." *Id.* (cleaned up). In this context, if the non-moving party has offered evidence supporting the initial damages award, such that reasonable minds may differ on the matter, the motion for JNOV should be denied. *See Aronson & Co. v. Fetridge,* 181 Md. App. 650, 665 (2008).

### II.

### ANALYSIS

Adcor advances two principal arguments on appeal. *First*, Adcor contends that the circuit court erroneously interpreted and applied the NDA. Adcor insists that the circuit court considered and accepted Berretta's argument—made for the first time in its renewed motion for judgment—that the NDA was ambiguous, and then improperly construed it

10

against Adcor, as the author of the NDA.  As a result, Adcor argues, the court erroneously interpreted paragraph 3 of the NDA to limit the recoverable damages to "the amount of fees, compensation, or other remuneration earned by [Beretta] as a result of any breach[,]" to the exclusion of damages allowed under Maryland law.

*Second*, Adcor contends that the circuit court erroneously found that the jury's damages award was not supported by the evidence.  Adcor insists that it adduced sufficient evidence that it was, in fact, damaged by Beretta's breach of the NDA, and that the jury had an ample evidentiary basis on which to quantify the damages.

We will address each of these arguments in turn.

## A.

### THE TRIAL COURT'S INTERPRETATION OF THE NDA

Adcor devotes about eight pages of its brief to arguing that the court took Beretta's bait by finding that the NDA was ambiguous and that it should be construed against Adcor as the drafter.  Referring to the court's purported ambiguity finding, Adcor argues that Beretta waived that issue by waiting until its renewed motion for judgment to raise it for the first time, and concludes that "[i]t was therefore improper for the trial court to grant JNOV on this ground."  Adcor goes on to assert that the NDA's language on the available remedies was not ambiguous and the trial court's decision to construe it against Adcor was "legally incorrect."  As a result of this error, Adcor contends that the court improperly determined that under paragraph 3 of the NDA, Adcor's recovery was limited to "three types of money damages: (1) fees, (2) compensation and (3) other remuneration earned by Beretta as a result of its breach."

11

We are not persuaded. The court expressly acknowledged that paragraph 3 of the NDA: (1) permitted Adcor to seek injunctive relief and damages for a breach of the NDA; (2) allowed Adcor to obtain, as damages, the "amount of fees, compensation or other remuneration earned by [Beretta] as the result of any breach of Section 2"; and (3) required Beretta to indemnify Adcor for any costs or expenses, including legal fees, incurred or resulting from an actual or threatened breach. The trial court also acknowledged that Maryland law allows for recovery of reasonably foreseeable damages proximately caused by the breach that are proven with reasonable certainty.

Here's what the trial court said in its entirety:

The question becomes whether Plaintiff[s] offered sufficient evidence of actual damages under the Remedies Clause of the NDA or more broadly, as required under Maryland Law. It is [uncontroverted] that the NDA was drafted by the Plaintiff[s]. In the event of a breach, Paragraph 3 provides the remedies. The Plaintiff may seek money damages and injunctive relief. The last paragraph, or the last sentence I should say of Paragraph 3, under the remedies clause states as follows, quote, "As part of its money damages for the period of time during which the covenantor, in this case Beretta breaches Section 2 of the NDA the appropriate Adcor entity shall be entitled to recover the amount of fees, compensation or other remuneration earned by the covenantor as the result of any breach of Section 2." Then Paragraph 4 expressly provides that in the event of a breach or threat of breach of the agreement Defendant shall indemnify Plaintiff quote, "Its costs, expenses and fees, including, without limitation reasonable attorney's fees resulting from or incurred in connection with such a breach or threatened breach." When Jury Instructions were discussed with counsel, it was agreed that there would be no instruction on consequential damages. Even if the Plaintiff[s] were not limited to the damages expressly provided for on Page 2 of the NDA. In general for actual damages as a result of a Breach of Contract Maryland Law does require sufficient evidence of a breach that proximately causes Plaintiff['s] losses. It also requires that that breach be one or the losses be such that they were reasonably foreseeable. And the losses must be proven with reasonable certainty. The Plaintiff[s] file suit in 2015. The Plaintiff[s] elected not to pursue injunctive relief, which was their right to do. However, at trial, the Plaintiff[s] also failed to introduce evidence of

12

attorney's fees, cost, expenses or other remuneration earned by the covenantor as a result of any breach.

In reviewing the closing argument Plaintiff[s'] counsel pointed to two specific pieces of evidence to support an award of damages. Quote,

> "You can't force them to give our documents back anymore, but you can compensate Adcor for what [it's] lost in Research and Development, what was stolen from them and you can compensate them for what they would have lost in the future. This is a document that is in evidence. This is the projections for Beretta for simply three years, going into 2019. That in three years they projected to make 36 million on our rifle. The one that we built for them. The one that they took our stuff on. That is their numbers. Those are not my numbers. It took us 12 million to build it. Their estimating revenue, 36.8 million within three years. That doesn't include the law enforcement market. That doesn't include the military market and that doesn't include the international market. And then they come up and say, well, none of this stuff is valuable. We've shelved the project again. How convenient that one month before the trial starts you say now it's shelved."

And then Mr. Marshall objected. I sustained the objection. And Plaintiff[s'] counsel continued. And that's found at Trial Transcript Page 1,481, lines 1 and 2. The Plaintiff[s'] counsel in closing went on to tell the jury quote to,

> "Imagine how big that number is and imagine how much revenue Adcor would have received had this all not been false promises and violations of the NDA."

That's found at the Trial Transcript page 1, 483, lines 3 through 6. Asking the jury to imagine is asking them to speculate. At trial, the Plaintiff[s] failed to offer sufficient proof of actual damages within the damages expressly available under the Remedies Clause of the NDA. And Plaintiff[s] also failed to prove damages proximately caused by the breach, that were reasonably foreseeable and with reasonable certainty. Specifically as for the 12 million dollars for Research and Development of the BEAR rifle, on cross examination, Mr. Stavrakis acknowledged that the design of the BEAR was already finalized before Adcor ever began negotiating with Beretta. And Mike Brown, the Adcor Engineer who, depending on who you believe designed or helped design the BEAR, and for whom the rifle is named after left Adcor on September 3rd, 2013. Again, assuming for the sake of

13

argument, a violation of the NDA agreement by the Defendant, the Plaintiff[s] failed to offer sufficient evidence that such a breach proximately caused reasonably foreseeable damages to a reasonable certainty. In addition, in tracking the language of the Remedies Clause of the NDA the 12 million for Research and Development on the BEAR rifle that Plaintiff[s'] counsel argued for during closing was not a quote, "Fee compensation or other remuneration earned by Beretta as the result of any breach." Again, that's the language directly from the Remedies Clause of the NDA. As for the other specific item of damage that the Plaintiff[s'] counsel requested in closing, that is the projected revenue for three years, to the sum of 36.8 million dollars. The uncontradicted evidence is that Defendant never followed through with manufacturing the BRX-15 and never earned any quote, "Remuneration." In addition, it's uncontradicted that the trademark for the BRX-15 lapsed, thus there was no proof of actual losses proximately caused by the NDA Breach, and the request for an award, based on a shelved project was speculative. The 1.2 billion dollar AR-15 Platform market was simply a number thrown out to the jury, without any connection to the Breach of the NDA. So again, there was no proof of actual damages in this case, particularly in light of the plain language of the NDA Remedies Clause and the failure of the Plaintiff[s] to prove with reasonable certainty losses proximately caused by any retention or dissemination of confidential information under the NDA. And as I noted, the parties agreed. We discussed all of the instructions to go to the jury, and the parties agreed that a Consequential Damages Instruction would be withdrawn by agreement of counsel. As a result, the Court is going to grant the request for a [Judgment] [Notwithstanding] Verdict pursuant to Maryland Rule 2-532, and revise the award to enter a judgment of $1.00 as nominal damages. And that's the Court's ruling. Thank you. You can be excused.

At no time during its lengthy explanation did the court find that the NDA was ambiguous or limit Adcor to the remedies provided under the NDA's remedies clauses. As we see it, Adcor got the benefit of both worlds—the trial court methodically considered each remedy allowed under the NDA as well as under Maryland law, and found the evidence wanting under each measure. Adcor's contentions to the contrary are without merit.

14

## B.

### FAILURE OF PROOF ON DAMAGES

Adcor contends that it presented sufficient evidence of damages to the jury. Adcor begins with the premise that, under Maryland law, once the non-breaching party proves that it was damaged, "the extent or the amount thereof may be left to reasonable inference." *Thomas v. Cap. Med. Mgmt.*, 189 Md. App. 439, 465 (2009). As evidence that it was, in fact, damaged, Adcor points us to testimony and documents establishing that its protected information was valuable, that Beretta knew it was valuable, and that Beretta knew that a breach of the NDA would damage Adcor.

Adcor then proffers two theories in support of the jury's award. Adcor first argues that the "jury could have considered the benefit conferred to Beretta based on its retention and use of Adcor's confidential information." Under its "benefit conferred" theory, Adcor states that the evidence showed that Adcor spent $12 million "developing the confidential information it disclosed to Beretta after the Parties executed the NDA."

Adcor's second theory is the "agreement in principle" approach, which, according to Adcor, compensates for Beretta's alleged dissemination and use. Adcor contends that the jury was presented with evidence of an agreement in principle under which Adcor and Beretta would "co-develop, manufacture and sell the BRX-15." Adcor sees this "agreement in principle" as the "basis for . . . the NDA between" Adcor and Beretta. Adcor then explains how the jury could have taken certain evidence—a price quote from Adcor for $80 per unit and Beretta's submission of a marketing variance to manufacture 100,000 units—as proof that the parties "had agreed on price and quantity" and thus reached an

15

"agreement in principle." And from that—presto!—the jury had enough information to assess Beretta for $8 million as a royalty for the sales it would have made under the agreement in principle. According to Adcor, the jury's $20 million award in compensatory damages can be explained by the $12 million in development costs and the $8 million in imputed royalty payments.

We will address both theories in turn.

### 1.

#### BENEFIT CONFERRED

The measure of damages under Maryland law is well settled: "In a breach of contract action, upon proof of liability, the non-breaching party may recover damages for 1) the losses proximately caused by the breach, 2) that were reasonably foreseeable, and 3) that have been proven with reasonable certainty." *Hoang v. Hewitt Ave. Assocs., LLC*, 177 Md. App. 562, 594 (2007) (citations omitted). "In this context, 'proximate cause' means losses that actually resulted from the breach." *Id.* "Losses that are speculative, hypothetical, remote, or contingent either in eventuality or amount will not qualify as 'reasonably certain' and therefore recoverable as contract damages." *Id.* at 595 (citation omitted).

Adcor failed to adduce evidence of damages proximately caused by Beretta's breach of the NDA.[5] Thus, Adcor urges us to adopt the "benefit conferred" approach to measuring

---

[5] At oral argument, by equating the development costs with market value, Adcor argued that the value of the information wrongfully retained by Beretta was $12 million. There is no evidence in the record about the market value of the information. There are

16

damages, suggesting that "Maryland caselaw is silent on measuring damages caused by a breach of NDA" under this theory. Adcor contends that Beretta conceded that it is an appropriate measure of damages in this case and maintains that "caselaw around the country" supports the use of a benefit conferred theory in similar cases. We disagree.

Maryland law is well-settled that the benefit conferred approach applies to claims for quasi-contract and unjust enrichment, in which the aim is not to compensate the plaintiff for damages sustained but rather to require an undeserving defendant to disgorge benefits that would be unjust to keep. *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 296 (2007) (quoting *Mass Transit Admin. v. Granite Constr. Co*., 57 Md. App. 766, 775 (1984)). The Court of Appeals explained that quasi-contract is a:

> [l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise. It is not based on intention or consent of the parties, but is founded on considerations of justice and equity, and on doctrine of unjust enrichment. It is not in fact a contract, but an obligation which the law creates in absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it.

*Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94-95 (2000) (quoting BLACK'S LAW DICTIONARY 324 (6th ed. 1990). Thus, a claim for unjust

---

many entrepreneurs who spent time and money developing products that were not accepted or valued by the market as much as the entrepreneur anticipated. That's one of many risks that entrepreneurs take. It's also why many entrepreneurs seek funding from investors—to spread the business risks, including that the product will be a dud when it's brought to market. Thus, standing alone, the evidence that Adcor spent $12 million in developing the Adcor B.E.A.R. did not provide a basis on which the jury could reasonably conclude that the value of the information retained by Beretta was $12 million.

enrichment is not available when "the subject matter of the claim is covered by an express contract between the parties." *Id.* at 96 (quoting *FLF, Inc. v. World Publ'ns, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998)).

We explained the logic behind this rule almost forty years ago in *Mass Transit Admin. v. Granite Constr. Co.*, in which we stated:

> The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests. (Citations omitted.) The reason for this rule is not difficult to discern. When parties enter into a contract they assume certain risks with an expectation of a return. Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated. As a result, they have no remedy under the contract for restoring their expectations. In desperation, they turn to quasi-contract for recovery. This the law will not allow.

57 Md. App. at 776 (quotation omitted).

This rule clearly applies here. Although Adcor invites us to create an exception when the broken contract happens to be an NDA, it provides no cogent reason for doing so. Contracts are voluntary undertakings that obligate the parties to duties and responsibilities that they otherwise wouldn't have assumed. The risks of signing a contract are many and often unforeseen. Before signing a contract, the parties must assess whether the expected benefits of the transaction outweigh the risks, including the possibility that they underestimated or failed to protect against all of the risks. If they decide to proceed, it means that they accepted all risks and mutually agreed to the rules governing their relationship moving forward. Parties enter into contracts with the reasonable expectation that the courts will enforce those rules. *See Calomiris v. Woods*, 353 Md. 425, 445 (1999) ("Contracts play a critical role in allocating the risks and benefits of our economy, and

18

courts generally should not disturb an unambiguous allocation of those risks in order to avoid adverse consequences for one party."); *see also Hall v. Lovell Regency Homes Ltd. P'ship*, 121 Md. App. 1, 13 (1998) (quoting *Andrulis v. Levin Const. Corp.*, 331 Md. 354, 374 (1993)) (explaining that the function of breach of contract damages is to "vindicate the promisee's expectation interest," not to rewrite the terms of their bargain more to the liking of the party who, in retrospect, regrets the deal it made).

We see no reason to make an exception for NDAs. NDAs are executed in a variety of contexts, including employment relationships, potential mergers and acquisitions, and, like here, potential joint ventures. NDAs include provisions that define the nature and scope of the protected information, the measures the receiving party must take to safeguard the information, the circle of people with access to the information, how the receiving party can use the information, what must be done with the information once the relationship ends, and the remedies available if the receiving party breaches the NDA. The allocation of risk reflected in NDAs is just as important and central to the expectations of the parties of an NDA as it is with respect to other types of contracts.

This case proves the point. Even though Maryland law does not provide an unjust enrichment remedy for a breach of contract, somehow Adcor convinced Beretta to agree to the language in paragraph 3 of the NDA that permits Adcor to recover, "[a]s part of its money damages . . . the amount of fees, compensation, or other remuneration earned by" Beretta as a result of its breach of its obligations under paragraph 2 of the NDA. In other words, Adcor bargained for an unjust enrichment remedy to which it otherwise would not have been entitled under Maryland law. And although in retrospect Adcor wishes it

19

bargained for a broader remedy that included *any* benefit conferred upon Beretta, the role of the courts is not to alter the negotiated allocation of risks just because one of the parties comes to regret the deal it made. *See AAC HP Realty, LLC v. Bubba Gump Shrimp Co. Restaurants, Inc.*, 243 Md.App. 62, 73 (2019) (claim for unjust enrichment not available where contract covers the same subject matter).

If we did, the unfairness to Beretta would be palpable. Had Adcor insisted on including such a remedy in the NDA before they signed it, Beretta would have had options. For example, it could have tried to convince Adcor to drop the request. If Adcor had refused, Beretta could have tried to negotiate for something additional in return, or it could have refused to sign the NDA and walked away. And, of course, Beretta could have acquiesced to the term, but if it did, it would have been assuming that risk voluntarily and at a time when it could have taken added precautions to mitigate it.[6] None of those options are available if the additional liability is imposed after the breach occurs, which is what Adcor would have us allow here.

Adcor relies on an out-of-state case, *Ajaxo Inc. v. E\*Trade Grp. Inc.*, 135 Cal. App. 4th 21 (2005), to support its benefit conferred theory of damages. In *Ajaxo*, the plaintiff proved that the defendant violated the terms of their NDA by disclosing the protected information to a competitor who, as a result, was able to provide the same product at lower prices. Adcor is correct that as damages for the breach of the NDA, the plaintiff was awarded traditional unjust enrichment damages—the value or benefit received by the

---

[6] For example, Beretta could have imposed tighter controls for access, dissemination, and use than it otherwise employed.

defendant. *Id.* at 55-57, 55 n.32. That wasn't because the court in *Ajaxo* determined that unjust enrichment damages, as a matter of California law, were generally recoverable for a breach of NDA, but rather because the NDA in *Ajaxo* expressly "allow[ed] for an equitable remedy in addition to 'whatever remedies it might have at law.'" *Id.* at 55 n.32. In other words, the unjust enrichment measure of damages that the court applied was grounded in the parties' contract.[7]

Not so here. Here, the unjust enrichment remedy incorporated into the NDA was more limited than the one in *Ajaxo* in that it allowed for recovery of *only* fees and compensation received by Beretta as a result of the breach, of which there were none. *Ajaxo* does not advance Adcor's cause.[8]

In sum, the settled measure of contract damages under Maryland law serves its function for NDAs as much as it does for other contracts. Accordingly, we hold that the benefit conferred approach does not apply to Adcor's claim against Beretta for breach of the NDA.

---

[7] Unlike in Maryland, where unjust enrichment is not considered to be "equitable in nature," *see AAC HP Realty, LLC*, 243 Md. App. at 70 n.5, in California it is viewed as an equitable remedy. *See, e.g.*, *Munoz v. MacMillan*, 195 Cal. App. 4th 648, 661 (2011).

[8] Adcor argues that Beretta conceded that the damages to Adcor could properly be measured by the benefit conferred to Beretta, and that this necessarily equals the $12 million that Adcor had spent researching and developing an AR-15 style rifle. We disagree. The statement by Beretta's counsel on which Adcor relies did not concede that the $12 million spent on developing the BRX-15 qualified as recoverable damages under the benefit conferred theory. Rather, in context, it is clear that Beretta's counsel was arguing that Adcor could not recover under the limited benefit conferred measure provided under paragraph 3 of the NDA because there was no evidence that Beretta earned any fees, compensation or other remuneration, all of which would be recoverable under paragraph 3 of the NDA.

21

## 2.

### THE AGREEMENT IN PRINCIPLE

Adcor also argues that the parties had an "agreement in principle" to co-develop, manufacture, and sell an AR-15 style rifle, and that the jury could have used the contemplated profit projections to come up with a damages award in the form of a projected royalty.

Here, however, the trial court dismissed Adcor's claim based on the alleged agreement to co-develop the rifle. By our count, 13 of the 16 counts in Adcor's sixth amended complaint sought damages based on an alleged agreement or promise to co-develop and sell the BRX-15, none of which survived either summary judgment or Beretta's motion for judgment. Adcor did not challenge the dismissals of such counts on appeal. In essence, Adcor is urging us to adopt a rule that, as damages for breach of a contract that *was* made, the non-breaching party is entitled to the damages it would have incurred for breach of a contract that *wasn't* made. Maryland law allows for no such recovery.

Moreover, the jury had no evidence from which it could have concluded Beretta's breach of the NDA somehow resulted in lost royalties. The evidence adduced at trial showed that Adcor never realized any revenues or profits from the BRX-15 not because Beretta breached the NDA, but rather because Beretta chose not to do business with Adcor, which was its right.

In support of its argument, Adcor cites to *Vitro Corp. of Am. v. Hall Chem. Co.*, 292 F.2d 678 (6th Cir. 1961). The Sixth Circuit's opinion provides no sound basis for us to

reach a different conclusion. Adcor cites *Vitro* for the proposition that the "agreement in principle" approach is an accepted measure of contract damages for breach of an NDA. However, in *Vitro*, the court treated the breach of the NDA as a misappropriation of a trade secret. *Id.* at 682-83. In doing so, the court likened that claim to a patent infringement case, where precedent supported such an approach when damages were sustained but difficult to quantify. *Id.* Here, that remedy would have been available under Adcor's claim for misappropriation of trade secrets. *See* Md. Ann. Code Commercial Law (1975, 2013 Repl. Vol.) § 11-1203. But that count was dismissed, and Adcor chose not to challenge that dismissal on appeal. We decline to permit Adcor to bootstrap the statutory remedy from its failed misappropriation claim onto its claim for breach of the NDA, particularly a remedy that rests on speculation of an agreement that never was.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS**.

23